**TRAIL MOUNTAIN COAL COMPANY, Plaintiff, Appellant, and Cross-Appellee,**

v.

**The UTAH DIVISION OF STATE LANDS AND FORESTRY; Ralph Miles, Director of the Division of State Lands and Forestry; The Utah Department of Natural Resources; and Dee Hansen, Executive Director of the Utah Department of Natural Resources, Defendants, Appellees, and Cross-Appellant.**

No. 930226–CA.

Court of Appeals of Utah.

Oct. 27, 1994.

William B. Prince (argued), Ballard Spahr Andrews & Ingersoll, L.R. Curtis, Jr., Brian T. Hansen, Holme Roberts & Owen, and Calvin L. Rampton, Jones, Waldo, Holbrook & McDonough, Salt Lake City, for Trail Mtn.

Gayle F. McKeachnie (argued), Clark B. Allred, McKeachnie and Allred, Vernal, for Lands & Forestry.

Jan Graham, State Atty. Gen., Stephen G. Boyden, Asst. Atty. Gen., Salt Lake City, for appellees.

Before BENCH and BILLINGS, JJ., and ORME, Associate P.J.

ORME, Associate Presiding Judge:

Plaintiff Trail Mountain Coal Company appeals the trial court's decision requiring Trail Mountain to pay additional royalties arising from its coal mining lease with the State. We affirm the trial court's decision in part, reverse in part, and remand for a reevaluation of the amount due.

## FACTS

Trail Mountain Coal Company operates an underground coal mine located west of Orangeville, Utah. Part of the mine is on Utah school trust land,[1] from which Trail Mountain has extracted coal pursuant to a State lease agreement. The State lease was initially issued to Malcolm N. McKinnon in 1965, who assigned the lease, with the approval of the Director of the State Land Board (the Director), to Myron F. Fetterolf on July 11, 1979. On August 13, 1979, Fetterolf orally assigned the lease to Trail Mountain, at which time he also notified the Director that Trail Mountain would be operating the mine. In a document executed by Fetterolf's estate, the assignment was later reduced to writing. Trail Mountain mined coal from the leased property from 1979 through 1985, submitting all required quarterly Coal Production & Settlement Transmittal forms to the Division of State Lands and Forestry, then known as the Division of State Lands (the Division), and enclosing the state royalty payment it calculated in accordance with the instructions set forth in the forms.

The State lease required the payment of a royalty on all coal mined from the school trust land. According to the language of the lease, the lessee agreed

[t]o pay to Lessor quarterly, on or before the 15th day of the month succeeding each quarter, royalty

(a) at the rate of 15¢ per ton of 2000 lbs. of coal produced from the leased premises and sold or otherwise disposed of, or

(b) at the rate prevailing at the beginning of the quarter for which payment is being made, for federal lessees of land of similar character under coal leases issued by the United States at that time,

whichever is higher....

Beginning with its first production from the state-leased portion of the mine, apparently in 1979, Trail Mountain paid the Division a fifteen cents per ton royalty, under subsection (a), for the coal it extracted. When the lease was originally issued in 1965, the royalty rate set by the federal government on its coal leases was also fifteen cents per ton. However, in August of 1976, the federal government changed the generally applicable royalty rate on underground coal leases from fifteen cents a ton to eight percent of the value of the coal produced.[2] All

---

1. School trust land is land granted to the State of Utah by the federal government for the support of public schools. These lands were managed by the Utah Division of State Lands and Forestry. *See* Utah Code Ann. § 65A–1–4 (1993). At the time of the audit, the Division had the authority to manage the lease affecting the Trail Mountain mine. The Division of State Lands and Forestry no longer has the authority to manage the State's mineral estates on school trust lands. *See* Utah Code Ann. § 65A–1–4 (Supp.1994). Now the Director of School and Institutional Trust Lands has management control over mineral leases on school trust lands. *See* Utah Code Ann. §§ 53C–2–401 to –414 (Supp.1994). However, the Director's authority does not "limit or invalidate audits conducted by the Division of State Lands and Forestry prior to the effective date of this act." *Id.* § 53C–2–103(2).

2. On August 4, 1976, the United States Congress passed the Federal Coal Leasing Amendments Act of 1975, which was codified at 30 U.S.C. §§ 201–209 (1986). The Act's provisions relating to royalties payable under federal coal leases provide that

[a] lease shall require payment of a royalty in such amount as the Secretary shall determine of not less than 12½ percentum of the value of coal as defined by regulation, except the Secretary may determine a lesser amount in the case of coal recovered by underground mining operations.

*Plateau Mining Co. v. Division of State Lands & Forestry,* 802 P.2d 720, 726 (Utah 1990) (quoting 30 U.S.C. § 207(a) (1988)). Federal regulations promulgated under the Act provide that

[a] lease shall require payment of a royalty of not less than 8 percent of the value of coal

federal underground mining leases thereafter issued or readjusted in Utah, with minor exceptions, contained the new eight percent royalty provision.

Continuously from 1979, the Division received Trail Mountain's subsection (a) royalty payments without question or protest. Division employees also informed Trail Mountain at various times that the royalty rate was still fifteen cents per ton. However, in 1985 the Division conducted an audit of the royalties received on its various coal leases. As a result of the audit, the Division concluded that Trail Mountain had underpaid its royalties from 1979 through 1984. According to the audit, Trail Mountain should have been paying royalties under subsection (b) of the lease agreement rather than subsection (a), because the prevailing federal rate of eight percent for newly issued leases was higher than the fifteen cents per ton rate.

The Division informed Trail Mountain of the audit results by letter dated October 15, 1985, and also provided it with a copy of the Royalty Audit Report. The report concluded that Trail Mountain had underpaid the required royalties by $3,351,474.75. The report also calculated $1,854,115.69 in interest due on the unpaid amount and assessed a late penalty of $16,606.76. The report based the interest amount on the statutory rate of six percent for the period from November 1, 1979, to June 30, 1981; upon the revised statutory rate of ten percent for the period from July 1, 1981, to November 30, 1982; and upon a regulation adopted by the Board of State Lands in November of 1982, purportedly imposing an eighteen percent rate, for the period from December 1, 1982, to October 15, 1985. The Division assessed the penalty based on a rule it promulgated in December of 1983. As a result of the audit report, the Division requested payment from Trail Mountain of unpaid royalties, interest,

and penalties in the total amount of $5,222,-197.20.

Trail Mountain disputed the auditor's interpretation of the lease and sought a redetermination of the royalty amount due under the agreement. After exhausting its administrative remedies, Trail Mountain filed the present action to enjoin collection of the claimed royalty amounts. The trial court initially granted Trail Mountain summary judgment, but the Utah Supreme Court reversed that decision and remanded the case. *See Plateau Mining Co. v. Division of State Lands & Forestry,* 802 P.2d 720, 732 (Utah 1990). Following a three-day bench trial, the trial court entered judgment for the Division, ruling that Trail Mountain owed the sum of $3,631,615.53 in delinquent royalty payments together with prejudgment interest at the rate of 6% per annum on each delinquent payment, amounting to $2,070,955.93, for a total judgment of $5,702,571.46.

Trail Mountain appeals the trial court's judgment on various grounds. Its principal claim is that the court erred in interpreting the lease as requiring Trail Mountain to pay an eight percent royalty on the coal mined during the audit period. In the alternative, Trail Mountain argues that even if the lease can be construed to require payment of the higher royalty rate, the trial court erred in ruling that certain royalty claims were not barred by the Statute of Limitations and in failing to allow Trail Mountain to deduct its transportation costs. Finally, Trail Mountain disputes the award and amount of prejudgment interest.[3] The Division cross-appeals, asserting that the trial court should have awarded a higher rate of interest and additional late fees.

## ROYALTY PROVISION OF THE LEASE

 Trail Mountain argues that the trial court erred in its interpretation of the lease

---

removed from an underground mine, except that the authorized officer may determine a lesser amount, but in no case less than 5 percent if conditions warrant.

*Id.* (quoting 43 C.F.R. § 3473.3–2 (1989)).

**3.** Trail Mountain also claims that the trial court erred in ruling that the transfer of the State coal lease was an assignment, rather than a sublease,

and that therefore Trail Mountain is primarily liable for payment of the royalty deficiency. We have considered Trail Mountain's claim, find it to be without merit, and decline to address it. *See State v. Carter,* 776 P.2d 886, 888–89 (Utah 1989); *State v. Vigil,* 840 P.2d 788, 795 (Utah App.1992), *cert. denied,* 857 P.2d 948 (Utah 1993).

agreement. A trial court's interpretation of an unambiguous contract constitutes a question of law, which we review for correctness. *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1313 (Utah App.1991); *Wilburn v. Interstate Elec.*, 748 P.2d 582, 585 (Utah App.1988), *cert. dismissed*, 774 P.2d 1149 (Utah 1989). However, "[i]f the contract is ambiguous, i.e., susceptible to varying interpretation, extrinsic evidence may be introduced to clarify the parties' contractual intent." *Majestic*, 818 P.2d at 1313. *See Barnes v. Wood*, 750 P.2d 1226, 1229 (Utah App.1988). In such cases, "[w]e review the trial court's construction based on extrinsic evidence under the more deferential clearly-erroneous standard." *Majestic*, 818 P.2d at 1313. *Accord Wade v. Stangl*, 869 P.2d 9, 12 (Utah App.1994).

The trial court ruled that the lease required Trail Mountain to pay quarterly royalties at the same rate as then prevailed for newly-issued federal leases. In contrast, Trail Mountain argues that we should interpret the lease to require payment at the prevailing rate for federal leases actually in production, as it claims was the parties' intent. Under such an interpretation, Trail Mountain would only be obligated to pay fifteen cents per ton, up until the point at which the prevailing rate for federal leases in production was eight percent.

Trail Mountain's argument fails. The Utah Supreme Court already addressed the issue of which rate applies in Trail Mountain's previous appeal. *See Plateau Mining Co. v. Division of State Lands & Forestry*, 802 P.2d 720 (1990). In *Plateau Mining*, the trial court granted summary judgment for Trail Mountain, ruling that the lease was ambiguous, and therefore unenforceable, because it did not contain the alternative federal rate within the royalty provision. *Id.* at 725–26. In reversing the trial court, the

Supreme Court specifically considered the meaning of the royalty provision and concluded that the language of the lease was unambiguous, insofar as it clearly established how the federal rate was to be determined.[4] *See id.*

Regarding the parties' intent, the Supreme Court decided that "[t]he intent of the parties was that the higher of the [state and federal] rates should be paid to the State." *Id.* at 726. In determining what that rate was, the Court stated that "[t]he alternative rate provision, based on the prevailing federal rate clause, provides a practical method by which the appropriate royalty can be determined." *Id.* As quoted by the Court, federal regulations in effect at the time required a royalty payment on underground coal leases " 'of not less than 8 percent of the value of the coal removed.' " *Id.* (quoting 43 C.F.R. § 3473.3–2(a)(3) (1989)). Moreover, the Supreme Court concluded Trail Mountain "had the duty to determine whether the prevailing federal rate was higher and, if so, to pay at that rate." *Id.* at 728.

Thus, we believe the Supreme Court has already decided the issues of contract ambiguity, the parties' intent regarding the alternative payment schedule, and the establishment of the federal royalty rate. However, to the extent the Supreme Court's decision left unresolved the proper interpretation of the lease language, Trail Mountain's argued-for interpretation is contrary to its plain meaning. The royalty provision provides, with our emphasis, that payment shall be made "at the rate prevailing, at the beginning of the quarter for which payment is being made, for federal lessees of land of similar character under coal leases *issued by the United States at that time.*" As the Utah Supreme Court observed, "[t]he language of the lease provision is clear." *Plateau Min-*

---

4. Trail Mountain relies heavily on subsequent references in *Plateau Mining* to ambiguity and the need for extrinsic evidence. *See Plateau Mining Co. v. Division of State Lands & Forestry*, 802 P.2d 720, 726–27 (Utah 1990). We believe the apparent inconsistency in the opinion—which refers to the lease as being both clear and ambiguous—can be readily explained. In essence, the Court held that subsection (b) clearly and unambiguously defined an alternative royalty rate, namely the dominant royalty rate for federal leases, issued at the start of the relevant calendar quarter, levied on underground mining operations. While the provision itself is clear, resort to extrinsic evidence is nonetheless necessary to show what the going federal royalty rate would be at any particular time and how such a rate translates into an amount greater than fifteen cents per ton, the royalty rate under subsection (a).

*ing,* 802 P.2d at 726. The lease clearly states the royalty rate shall be the prevailing rate in federal leases for similar lands issued at that time, i.e., as of the beginning of the quarterly royalty period, not of federal leases then in production, most of which, being older, still reflected the fifteen cents per ton rate. Thus, the trial court properly interpreted the lease to require payment at the prevailing rate of currently-issued federal leases, not the prevailing rate of leases then in production.

In sum, Trail Mountain's claim that it was only obligated to pay fifteen cents per ton during the audit period cannot stand. There is no dispute that the prevailing rate for federal leases *issued* during all calendar quarters in the audit period was eight percent. All federal leases for underground mining operations issued or readjusted in Utah during the audit period, with minor exceptions, required a royalty payment of eight percent of the value of the coal. Accordingly, the plain language of the lease and the Supreme Court's previous interpretation require the conclusion that Trail Mountain was obligated to pay the higher rate of eight percent. We therefore affirm the trial court's order in this respect.

### TRANSPORTATION ALLOWANCE

■ Trail Mountain also claims the trial court erred in not allowing it to deduct its transportation costs before determining the required royalty payment. Under the current federal royalty scheme, in which lessees are required to pay eight percent of the *value* of the coal, the lessees are first entitled to deduct transportation costs from the sale price before determining the coal's value. *See* 30 C.F.R. §§ 206.250, .257(a), .261(a) (1993). This is because the sale price does not equate to the coal's value, but rather reflects the value of the coal plus the cost of transporting it to the place of sale. *See id.*

The same should of course be true of the Utah royalty scheme when a State lessee, such as Trail Mountain, is obligated to pay the federal rate. In other words, the State lease incorporates the federal rate structure as a whole, not some selective variation thereof. Indeed, the Division's Production and Settlement Transmittal form, by which the State lessee is required to report the coal production and corresponding royalty amount, expressly provides, in the case of percentage royalties, for the deduction of "[a]ctual haulage costs to point of sale" before the net sale amount is multiplied by the applicable royalty percentage rate. Thus, it would appear that Trail Mountain was entitled to deduct its transportation costs from the sale price of its coal before applying the eight percent royalty rate.

However, the trial court ruled that Trail Mountain was not entitled to the transportation allowance because it neither applied for it, nor submitted its costs, when providing its coal production and royalty figures to the Division. However, since Trail Mountain calculated its royalty payment under the subsection (a) fifteen cents per ton method, it provided only the tonnage amount, which when multiplied by the rate, gave the required royalty. There was no reason for Trail Mountain to provide its transportation costs or even the sales price of the coal under that calculation method. Transportation costs are only considered when assessing royalties based on a percentage rate of the coal's value.

Only after the Division had completed the audit did the Division inform Trail Mountain that it would be subject to the subsection (b) eight percent royalty method, and this after years of tacitly and, sometimes, explicitly approving Trail Mountain's payment on the tonnage-based method. As a result, Trail Mountain had no reason or opportunity to submit its transportation costs for deduction prior to that point. Nor did the Division request those costs prior to the audit. Likewise, the royalty as determined by the audit did not reflect, by estimate or otherwise, a deduction for the significant cost of transportation.

We therefore conclude that the trial court erred in ruling that Trail Mountain was not legally entitled to a transportation allowance under the alternative eight percent royalty provision. While Trail Mountain may not have applied for such a deduction, the circumstances of the case effectively denied it

any such opportunity. We accordingly remand for a determination of whether Trail Mountain incurred transportation costs that were included in the valuation of the coal used in the Division's royalty calculation under subsection (b). If so, the trial court should deduct the transportation costs in determining the royalty amount due, in accordance with the federal royalty calculation methods contemplated in the lease.

## APPLICABLE STATUTE OF LIMITATIONS

■ Trail Mountain next claims the trial court erred in concluding that the statute of limitations has no application to the State when acting in its capacity as trustee of public school lands. Whether or not the State is exempt from a particular statute of limitations is a question of law, which we review for correctness. *See Gramlich v. Munsey,* 838 P.2d 1131, 1132 (Utah 1992). *See also Ward v. Richfield City,* 798 P.2d 757, 759 (Utah 1990) ("trial court's interpretation of a statute constitutes a question of law"). We agree the trial court erred, and remand for reconsideration of the period for which the Division may recover royalty payments.

■ It is true that states are generally exempt from the applicable statute of limitations when acting in their capacity as school land trustee. *See Van Wagoner v. Whitmore,* 199 P. 670, 675–76 (Utah 1921); *California State Lands Comm'n v. United States,* 512 F.Supp. 36, 41 (N.D.Cal.1981); *Laramie County Sch. Dist. v. Muir,* 808 P.2d 797, 800–01 (Wyo.1991). However, an exception to the general rule is triggered when the state itself, through its legislature, makes the statute of limitation applicable to the state. *See California State Lands Comm'n,* 512 F.Supp. at 41; *Laramie County Sch. Dist.,*

808 P.2d at 801. *See also State ex rel. Cartwright v. Tidmore,* 674 P.2d 14, 16 (Okla. 1983) (state immune from statute of limitations unless statute provides to the contrary).

The Utah Legislature has specifically included the State of Utah within the applicable statute of limitations. According to the Utah Code,

[t]he state will not sue any person for or in respect to any real property, *or the issues or profits thereof,* by reason of the right or title of the state to the same, unless:

(1) Such right or title shall have accrued within seven years before any action or other proceeding for the same shall be commenced.

Utah Code Ann. § 78–12–2 (1992) (emphasis added).[5] As if this section did not sufficiently indicate the Legislature's intent to include the State within the statute of limitations, another section provides that "[t]he limitations in this article apply to actions brought in the name of or for the benefit of the state or other governmental entity, the same as to actions by private parties." Utah Code Ann. § 78–12–33 (1992).[6]

Given the statutory scheme, we can only conclude that the Legislature intended to subject the State to the applicable statute of limitations. Accordingly, the Division's claims for royalties outside the seven-year period are barred.[7]

## PREJUDGMENT INTEREST

■ Finally, Trail Mountain appeals the trial court's award of prejudgment interest, claiming such an award was erroneous because the lease royalty provision was allegedly subject to different interpretations, and therefore the royalty amount was too uncertain to support an award of prejudgment interest. The trial court's award of prejudgment interest, and the amount thereof, "pres-

---

5. Trail Mountain argues that the applicable statute of limitations is found in Utah Code § 78–12–23(2) (1992), which imposes a six-year statute of limitations on actions based "upon any contract, obligation, or liability founded upon an instrument in writing." However, § 78–12–23 does not so much as mention the State, and is otherwise inapplicable given the specific language in Utah Code Ann. § 78–12–2 (1992).

6. An exception exists for actions brought by the State to recover damages in asbestos litigation. *See* Utah Code Ann. §§ 78–12–33, –33.5 (1992).

7. It is unclear whether this correction of legal error makes any actual difference, i.e., whether any of the royalties in issue actually fall outside the seven-year period, properly calculated. We leave that question for resolution on remand.

ent[ ] a question of law which we review for correctness." *Andreason v. Aetna Casualty & Sur. Co.*, 848 P.2d 171, 177 (Utah App. 1993). As a result, " 'we need not accord any particular deference to the decisions below.' " *Id.* (quoting *Vali Convalescent & Care Insts. v. Division of Health Care Fin.*, 797 P.2d 438, 444 (Utah App.1990)).

■ The purpose behind awarding prejudgment interest is to fully compensate the damaged party. *Id.; Fell v. Union Pac. Ry. Co.*, 32 Utah 101, 107–08, 88 P. 1003, 1005–06 (1907). However, prejudgment interest should only be awarded "in situations where the damage is complete, the loss can be measured by facts and figures, and the amount of loss is fixed as of a particular time." *Andreason*, 848 P.2d at 177. *See Bjork v. April Indus., Inc.*, 560 P.2d 315, 317 (Utah 1977), *cert. denied*, 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977). Where such "certainty exists, courts should allow interest from the time when damages became fixed, rather than from the date of the judgment." *Andreason*, 848 P.2d at 177. *See Bjork*, 560 P.2d at 317.

This is clearly a case in which damages are calculable with mathematical precision, and prejudgment interest is properly awarded. Measuring the difference between what Trail Mountain paid in royalties under subsection (a) and what the lease required under subsection (b) is a simple matter of multiplying the coal's net value by eight percent and subtracting the amount which Trail Mountain had already paid. We therefore affirm the trial court's decision to award prejudgment interest.

■ However, we must still determine at what point the interest began to accrue. The trial court ruled that prejudgment interest began accruing when the royalty payments became due. We disagree. Prejudgment interest only begins to accrue after demand for payment has been made. *Staker v. Huntington Cleveland Irrigation Co.*, 664 P.2d 1188, 1191 (Utah 1983); *Marcus v. Fox*, 150 Ariz. 342, 723 P.2d 691, 694 (App.1985); *Holst v. Guynn*, 696 P.2d 632, 635–36 (Wyo. 1985). Trail Mountain was not on notice of the deficiency in payments—nor was any deficiency carried on the Division's books—

until after the Division completed its audit. Only at that point did the Division demand payment of the allegedly underpaid royalty amounts. In fact, prior to the Division's audit, Division employees had informed Trail Mountain that it was current in its payments and correct in calculating the royalty amount under subsection (a) of the lease.

Accordingly, we hold that the trial court erred in assessing interest from the due dates of the various royalty payments. Rather, prejudgment interest began accruing on the underpaid royalty amounts as of the date the Division demanded payment.

### THE DIVISION'S CROSS–APPEAL

■ The Division cross-appeals the trial court's award, claiming the trial court erred in awarding interest at a rate of only six percent and in failing to assess late penalties against Trail Mountain. The Division claims that the trial court should have awarded interest at a higher rate and should have assessed late fees, all as established by administrative regulations.

The State lease did not contain any provision regarding interest or penalties on past due payments. However, Utah law does provide for a statutory rate of prejudgment interest on contractual obligations. According to the current prejudgment interest statute, Utah Code Ann. § 15–1–1(2) (1992), "unless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum." However, the current ten percent interest rate does not apply "to any contract or obligations made before May 14, 1981." *Id.* § 15–1–1(3). *See SCM Land Co. v. Watkins & Faber*, 732 P.2d 105, 108–09 (Utah 1986). Rather, contracts entered into before that date are subject to the earlier statutory rate of six percent. *SCM Land Co.*, 732 P.2d at 109. Accordingly, the trial court ruled that six percent was the applicable rate because the lease agreement was entered into prior to May 14, 1981.

The Division argues that both the lease and Utah law authorize the State Land Board to set its own interest rate and penalty scheme. The Division first focuses our

attention on Article I of the lease agreement, which reads as follows:

This lease agreement is granted subject in all respects to and under the conditions of the laws of the State of Utah and existing rules and regulations and such operating rules and regulations as may be hereafter approved and adopted by the State Land Board.

Second, the Division points to Utah Code Ann. § 65–1–23 (1986), which states that

[e]xcept as otherwise provided by law, the State Land Board shall by rules and regulations prescribe the form of application, the form of lease, the annual rental, the amount of royalty and the basis upon which the royalty shall be computed, and such other details as it may deem necessary in the interest of the state.[8]

The trial court ruled that the State Land Board had no authority to unilaterally change the applicable rate of interest and to impose penalties not mentioned in the lease. We agree. As previously noted, Utah law establishes the rate of prejudgment interest "[e]xcept when parties to a lawful contract agree on a specified rate." Utah Code Ann. § 15–1–1 (1992). Trail Mountain and the Division did not agree on a specified rate of prejudgment interest, nor to the imposition of penalties for the late payment of royalties.

The Division relies on general language in the lease which subjects Trail Mountain to "such operating rules and regulations as may be hereafter approved and adopted by the State Land Board." However, the monetary terms of the lease are simply not within the ambit of ever-changing "operating rules and regulations," which relate more to mining operations and methods than to core contract terms. Were we to rule otherwise, the State Land Board could simply change the material terms of a lease by subsequent unilateral fiat.

Nor does the statutory grant of rulemaking authority to the State Land Board, found in Utah Code Ann. § 65–1–23 (1986), allow the Board to change the material terms of the lease by subsequent rule. While section 65–1–23 authorizes the Board, "[e]xcept as otherwise provided by law," to establish rules and regulations prescribing the form of application, the form of lease, the amount of royalties and so forth, it says nothing about permitting the Board to retroactively alter existing leases. Nor does the "other details" language contemplate something as significant as a deviation from the generally prevailing statutory interest scheme. As already noted, Utah Code Ann. § 15–1–1 (1992) establishes the statutory rate for prejudgment interest in cases where the parties have not contractually agreed upon a rate.

Accordingly, we conclude that neither the lease language contemplating changes in operating rules nor the grant of authority found in section 65–1–23 provide a basis for altering the monetary terms of the lease, either in terms of deviating from the statutory rate of prejudgment interest or in assessing late fees. Therefore, we deny the Division's cross-appeal seeking a higher interest rate and late fees and affirm the trial court's decision in that respect.

## CONCLUSION

The trial court properly ruled that the State lease required Trail Mountain to pay the higher federal royalty rate. However, the trial court incorrectly concluded Trail Mountain was not legally entitled to a transportation deduction. On remand, the trial court must determine if Trail Mountain incurred transportation costs, and if so, deduct them from the sales price before assessing the eight percent royalty amount.

The trial court also erred in ruling that the Division's claims were not subject to any statute of limitations. While we reject Trail Mountain's contention that the six-year statute applies, we do hold the Division's royalty claims are subject to the seven-year statute. The trial court properly awarded prejudgment interest at the applicable statutory rate of six percent, and correctly denied the assessment of late fees. However, the trial court improperly assessed prejudgment interest from the time the royalty payments

---

8. This provision, along with the rest of Title 65, was repealed effective July 1, 1988. The equivalent provision currently in effect is found in Utah Code Ann. § 65A–6–2 (1993 & Supp.1994).

first theoretically came due, rather than from when the Division, following an audit, first demanded payment based on the federal rate.

Accordingly, we remand for a redetermination of the amount due in accordance with this opinion.

BILLINGS, J., concurs.

BENCH, J., concurs in the result.